IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | |
|---|---|
| NAJIB BIN-SALAMON, )<br>Plaintiff, )<br> )<br>v. )<br> )<br>COMMISSIONER OF SOCIAL SECURITY, )<br>Defendant. ) | Civil Action No. 4:13cv00062<br><br>By:   Joel C. Hoppe<br>United States Magistrate Judge |

**REPORT AND RECOMMENDATION**

Plaintiff Najib Bin-Salamon asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–422, 1381–1383f. This Court has authority to decide Bin-Salamon's case under 42 U.S.C. §§ 405(g) and 1383(c)(3), and his case is before me by referral under 28 U.S.C. § 636(b)(1)(B).

On appeal, Bin-Salamon objects to the Administrative Law Judge's ("ALJ") finding that his statements describing the intensity, persistence, and limiting effects of his neck and foot pain were not fully credible. *See* Pl. Br. 6–10, ECF No. 13. Having considered the administrative record, the parties' briefs, and the applicable law, I find that substantial evidence supports the Commissioner's final decision that Bin-Salamon is not disabled.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

1

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a) (governing claims for DIB), 416.905(a) (governing adult claims for SSI). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to

2

Case 4:13-cv-00062-JLK-JCH   Document 16   Filed 12/31/14   Page 2 of 19   Pageid#: 421

his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Bin-Salamon filed for DIB and SSI on November 23, 2010. *See* Administrative Record ("R.") 211, 220. He was 46 years old, *id.*, and had worked as an order filler, carpenter, cook, and mechanic, R. 193. Bin-Salamon said that he stopped working on April 1, 2008, because of pain in his neck and feet. *See* R. 186, 211, 220. The state agency twice denied his applications. R. 52–55.

Bin-Salamon appeared with counsel at an administrative hearing on November 22, 2011. R. 26. He testified as to his alleged impairments and to the functional limitations those impairments caused in his daily activities. R. 33–44. A vocational expert ("VE") also testified as to Bin-Salamon's past work and ability to perform other work existing in the national and regional economies. R. 45–50.

In a written decision dated February 24, 2012, the ALJ concluded that Bin-Salamon was not entitled to disability benefits. *See* R. 11–21. He found that Bin-Salamon suffered from severe "disorders of the muscle, ligament, and fascia" that did not meet or medically equal an impairment listed in the Act's regulations. R. 13, 14. The ALJ next determined that Bin-Salamon had the residual functional capacity ("RFC")[1] to frequently lift and carry ten pounds,

---

[1] "RFC" is an applicant's maximum ability to work "on a regular and continuing basis" despite his impairments. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC takes into account

3

occasionally lift and carry twenty pounds, stand and walk for four hours in an eight-hour day, and sit for more than six hours in an eight-hour day.[2] *See* R. 14. The ALJ noted that this RFC ruled out Bin-Salamon's return to his past work. R. 19, 46–48. Finally, relying on the VE's testimony, the ALJ concluded that Bin-Salamon was not disabled because he still could perform specific occupations existing in significant numbers nationally and in Virginia. R. 20. The Appeals Council declined to review that decision, R. 1, and this appeal followed.[3]

### III. Facts

A.   *Medical Evidence*

Bin-Salamon's medical records document a history of neck surgery, gout, and plantar fasciitis.[4] Bin-Salamon first reported foot pain on January 20, 2010. *See* R. 289. On exam, Dr. Sharon Reilly, M.D., observed that Bin-Salamon was "tender to just the lightest touch" over the right heel and the first metatarsophalangeal on each foot. *See id.* She diagnosed gout, prescribed Indomethacin, and instructed Bin-Salamon to follow up as needed. *See id.* Bin-Salamon returned on February 11 complaining of foot pain near his heel. *See* R. 287. He described "episodes" of chronic pain where his foot "sometimes bother[ed] him for weeks" and sometimes did not hurt

---

"all of the relevant medical and other evidence" in the applicant's record and must reflect the "total limiting effects" of the applicant's impairments. 20 C.F.R. §§ 404.1545, 416.945.

[2] The ALJ agreed with the VE's testimony that this RFC "would limit [Bin-Salamon] to jobs that are sedentary in nature." R. 19, 47–48. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools"; standing and walking may be required occasionally. 20 C.F.R. §§ 404.1567(a), 416.967(a).

[3] Bin-Salamon also submitted medical records from February and March 2013 with his request for the Appeals Council to review the ALJ's decision. *See* R. 2. The Appeals Council returned the records to Bin-Salamon because it determined that the records did not relate to the period on or before February 24, 2012. *See id.* Bin-Salamon did not submit these records to this Court.

[4] Plantar fasciitis is the inflammation of a thick band of tissue that runs across the bottom of the foot and connects the heel bone to the toes. *See* Mayo Clinic, *Plantar Fasciitis*, http://www.mayoclinic.org/diseases-conditions/plantar-fasciitis/basics/definition/con-20025664 (rev. Feb. 27, 2014). Common symptoms include stabbing pain near the heel that is "usually worse with the first few steps" after standing, sitting, or lying down for long periods. *Id.*

4

for six months. *Id.* Nurse Joseph Davis, F.N.P., noted tenderness to palpation of the heel, but no obvious deformities on either foot. *See id.* He assessed plantar fasciitis, prescribed Medrol, and instructed Bin-Salamon to return as needed. *See id.* Bin-Salamon next saw Nurse Davis on May 15; he complained of pain radiating from his trapezius to his shoulder, decreased range of motion in his neck, and chronic pain in his right foot. R. 285. Nurse Davis noted that Bin-Salamon had suffered a cervical spine fracture as a young man, but had experienced no significant consequences from that injury. *Id.* Bin-Salamon had a decreased range of motion of his neck. *Id.* Nurse Davis injected Bin-Salamon's shoulder with Lidocaine, prescribed Vicodin and Ibuprofen for pain, and referred Bin-Salamon to a podiatrist at his request. *See id.* He did not examine Bin-Salamon's feet on this visit.

Bin-Salamon established care with Dr. Danita Reese, D.P.M., at the Family Foot Clinic on May 25, 2010. *See* R. 306. He reported difficulty walking and bilateral foot pain for the past three months. *See id.* Following an exam, Dr. Reese noted that the "most probable diagnosis" was "plantar fasciitis left worse than right; tinea pedis; pain foot [*sic*]." R. 307. Dr. Reese administered cortisone injections bilaterally and prescribed Medrol and Lotrisone cream. *See* R. 306. She also wrote Bin-Salamon a prescription for static ankle foot orthoses to wear at night. *See* R. 305–06. Bin-Salamon returned to Dr. Reese's clinic on June 10. R. 308. He reported that the cortisone injections, orthoses, and foot exercises helped get his pain level down to "zero." R. 308. Dr. Reese noted that Bin-Salamon's condition was "much improved." *Id.* It is not clear what treatment, if any, Dr. Reese provided or recommended on this visit. *See, e.g.*, *id.* ("Rx: Support-- Plan: Use [illegible]."). She apparently did not object to Bin-Salamon's decision to "cut back on night splint wear" two weeks earlier. *Id.*

5

Bin-Salamon returned to Charlotte Primary Care on September 10, 2010, complaining of foot pain. *See* R. 283. Dr. Edwina Wilson, M.D., observed "tenderness" on palpation, extension, and flexion of the left foot. *See id.* She refilled Bin-Salamon's Vicodin prescription and instructed him to follow up in two months. *See* R. 283–84. Bin-Salamon returned on October 4, again complaining of foot pain. *See* R. 282. He told Nurse Davis that he was "seeing a podiatrist regularly" and that "his last set of injections only lasted about a month [before] his symptoms returned." *Id.* Nurse Davis noted "pain with palpation plantar aspect in the area of the metatarsals." *Id.* He refilled Bin-Salamon's Vicodin prescription and referred him to another podiatrist. *See id.*

Bin-Salamon saw Nurse Davis again on November 9, 2010, primarily to follow up on his hypertension and hyperlipidemia. *See* R. 280. He also reported debilitating chronic foot pain unabated by steroid injections, oral steroids, and nonsteroidal anti-inflammatory drugs. *Id.* He explained that he could not walk without assistance in the morning, but that his pain "improves a little bit" throughout the day. *Id.* Nurse Davis "somewhat reluctantly" refilled the Vicodin prescription and noted that he would consult with Dr. Reese after Bin-Salamon's upcoming appointment. *See id.* Bin-Salamon saw Dr. Reese on November 17, 2010. *See* R. 309. It appears that she diagnosed gout, administered an injection, and prescribed Indomethacin. *See id.*

Bin-Salamon returned to Charlotte Primary Care on December 30, 2010, complaining of "chronic pain secondary to plantar fasciitis and chronic gout." R. 318. He still was "unable to walk without assistance." *Id.* Nurse Davis observed "exquisite tenderness with palpation of the plantar fascia on [the] left foot." *Id.* He refilled Bin-Salamon's Lortab because he did not know what more could be done. *See* R. 319. Nurse Davis also noted that Bin-Salamon "for some reason [was] not taking his Allopurinol," a medication used to treat gout. *Id.*

On January 3, 2011, state-agency physician Dr. Wyatt Beazley, M.D., reviewed Bin-Salamon's medical record available through November 9, 2010. *See* R. 213. He opined that Bin-Salamon had a muscle, ligament, and fascia disorder. R. 214. Dr. Beazley explained that Bin-Salamon may experience bilateral foot pain "at times," but his medical records indicated that he still was "able to walk and move about normally." R. 218–19. As to Bin-Salamon's physical limitations, Dr. Beazley found that Bin-Salamon could lift, carry, push, and pull ten pounds frequently and twenty pounds occasionally; stand and walk for four hours in an eight-hour day; and sit for "more than six hours on a sustained basis" in an eight-hour day. R. 216.

On January 7, 2011, Bin-Salamon established care with Dr. Philip LeNoach, M.D., at Centra Southside Orthopedic and Rehabilitation Center. *See* R. 325–26. He reported experiencing bilateral foot pain for the past three years with "no clear history of injury or trauma." R. 325. Dr. LeNoach noted that Bin-Salamon had low arches but no "specific swelling o[r] signs of inflammation" in either foot. R. 326. X-rays showed "mild degenerative changes" in the right knee and "degenerative changes" in the midfoot. *Id.* Dr. LeNoach diagnosed "early degenerative changes consistent with gout arthropathy" and plantar fasciitis. *Id.* He recommended that Bin-Salamon get silicone inserts for his shoes and restart Allopurinol. *See id.*

Bin-Salamon returned to Dr. LeNoach's office on February 25, 2011, complaining of foot and neck pain. *See* R. 368–69. A physical exam was normal except for "tenderness . . . at the insertion of the plantar fascia." R. 368. Dr. LeNoach noted that Bin-Salamon "needs better inserts" in his shoes and "possibly [an] ultrasound." *Id.* A magnetic resonance image ("MRI") taken the same day showed "moderate" diffuse degenerative changes consistent with cervical spondylosis, although the alignment and vertebral body heights were maintained. R. 370. Dr. LeNoach referred Bin-Salamon to a neurosurgeon for his neck pain. *See* R. 368–69.

7

State-agency physician Dr. David Williams, M.D., reconsidered Bin-Salamon's applications on March 23, 2011. R. 242. He agreed with Dr. Beazley's earlier RFC except for the standing and walking restriction. Dr. Williams opined that Bin-Salamon should be further limited to two hours of standing and walking during an eight-hour day. *See id.*

Bin-Salamon saw Dr. George Hurt, M.D., at Central Virginia Neurosurgery on March 29, 2011. R. 363–64. He reported doing "fairly well" after his 1986 spinal fusion until about two years earlier while doing some "heavy lifting." R. 363. On exam, Dr. Hurt observed "limited" movement in Bin-Salamon's neck, particularly on rotation. *Id.* His station and gait were normal, and he did not report foot pain. *See id.* Dr. Hurt opined that Bin-Salamon's neck pain was "most likely due to muscle spasm and tightness rather than any significant structural abnormality." R. 364. He recommended muscle relaxants and physical therapy three times a week for eight weeks. *See* R. 362. As of April 14, Bin-Salamon had attended three physical therapy sessions. R. 352. Bin-Salamon returned to Dr. Hurt's office on April 19, 2011, reporting "no benefit" from treatment thus far. R. 357.

Dr. Hurt ordered an MRI of Bin-Salamon's cervical spine to determine whether surgical intervention was more appropriate than "further conservative treatment." R. 356. The results showed "mild broad-based posterior disc protrusion at C3-4" with moderate bilateral neural foraminal narrowing and "mild right-sided neural foraminal narrowing at C4-5." R. 354. There was no evidence of disc protrusion at the other cervical levels or of "significant cervical spinal stenosis." *Id.* Dr. Hurt later noted that he "would not advise surgery," as Bin-Salamon's signs and symptoms "fit more with a chronic cervical strain rather than nerve root impingement." R. 353. He recommended "conservative" treatment involving anti-inflammatory medicines and physical therapy as needed. *Id.*

8

On April 27, 2011, Bin-Salamon established care with Dr. Lisa York, M.D., at Chase City Primary Care. *See* R. 346. He reported experiencing "constant," "moderate" neck pain for more than ten years. *See id.* On exam, Dr. York noted that Bin-Salamon's cervical and lumbar paraspinal muscles were tender to palpation. *See* R. 347. She prescribed Gabapentin, Tramadol, and Robaxin, and referred Bin-Salamon to a pain-management specialist.[5] R. 348.

Bin-Salamon saw Dr. Manhal Saleeby, M.D., at CMH Pain Management Services on June 1, 2011. *See* R. 330–33. He reported experiencing chronic, constant pain in his neck, knees, feet, and multiple joints. R. 330. Dr. Saleeby observed that Bin-Salamon "had an exaggerated response . . . with pain behavio[r] displayed inconsistently during" an interview and thorough physical exam. R. 331. For example, Bin-Salamon exhibited an "unstable gait" only when Dr. Saleeby asked about his foot pain. *Id.* Otherwise, he stood without difficulty and walked without assistance. R. 332. A head-to-toe physical exam was generally within normal limits, R. 331–32, except for stiffness and reduced range of motion in Bin-Salamon's neck, R. 331.

Dr. Saleeby diagnosed degenerative changes in the cervical spine and knee, unspecified drug dependence, and chronic gouty arthropathy without tophus. R. 332–33. He recommended a "multidisciplinary approach" to managing Bin-Salamon's pain that emphasized relaxation techniques and physical activity as tolerated rather than narcotic pain medication and injections. R. 333. Dr. Saleeby twice noted that Bin-Salamon "did not seem interested" in any treatment plan not primarily involving narcotics. R. 333.

---

[5] Bin-Salamon returned to Chase City Primary Care on May 25, June 6, July 20, and July 26, 2011, for complaints related to elbow pain, high cholesterol, and hemorrhoids. *See* R. 342–44, 344–45 (elbow); R. 340–41 (cholesterol); R. 336–38 (hemorrhoids). He did not report foot or neck pain on these visits.

9

B.  *Bin-Salamon's Statements*

Bin-Salamon completed a Pain Questionnaire and Adult Function Report on December 14, 2010. *See* R. 201–10. He reported experiencing constant "aching, stabbing, throbbing, [and] crushing" pain in his back, neck, feet, and knees for at least the past three years. *See* R. 209–10. On a typical day, Bin-Salamon woke up, prepared simple meals for his son, kept his feet elevated, read, and watched television. R. 201, 205. He reported no problems tending to his personal needs other than occasional difficulty walking when he gets out of bed in the morning. *See* R. 202, 209. He did not drive independently, do yard work, cook "big meals," or regularly engage in activities outside the home. *See* R. 202–07. Bin-Salamon reported that pain affected his ability to sit, stand, walk, climb, lift, and reach. *See* R. 206. He estimated that he could stand for ten or fifteen minutes; walk for three, five, or ten minutes; and lift or carry fifteen pounds. *See* R. 206, 210.

In November 2011, Bin-Salamon testified that he was disabled by constant, chronic pain in his feet, knees, and neck. *See* R. 33–35. He estimated that he could sit for forty minutes; "move around" for fifteen minutes before needing to sit down; and lift ten pounds. R. 36, 39. Bin-Salamon testified that he spent his days lying in bed. *See* R. 42.

## IV. Discussion

Bin-Salamon objects to the ALJ's finding that his statements describing the intensity, persistence, and limiting effects of his impairments were "not credible" to the extent that they were inconsistent with the ALJ's final RFC determination.[6] *See generally* Pl. Br. 6–10. He

---

[6] Bin-Salamon also argues that the ALJ "besmirched" his character by noting that he once "tested positive for marijuana." Pl. Br. 9–10 (citing R. 18). He states that this evidence is irrelevant and prejudicial, and that the ALJ's decision to cite it "has a detrimental effect on the perception of the Social Security Administration as neutral, fair, and unbiased." *Id.* Bin-Salamon does not explain how this citation to a fact in the record affected the outcome of his case. *Id.* at

10

argues that the ALJ's credibility determination is legally flawed because the ALJ gave "no specific reason" for discrediting his statements beyond finding that they were "inconsistent with [the] previously established" RFC. *Id.* at 8. Bin-Salamon also argues that the ALJ's RFC impermissibly takes into account only the objective medical evidence in his record and "disregards" his subjective statements. *See id.* at 9. These arguments are without merit.

A.    *Bin-Salamon's Credibility*

The regulations set out a two-step process for evaluating a claimant's allegation that he is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart*, 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. §§ 404.1529, 416.929). The ALJ must first determine whether objective medical evidence[7] shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the amount and degree of pain alleged. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *see also Craig v. Chater*, 76 F.3d 585, 594–95 (4th Cir. 1996). If the claimant clears this threshold, the ALJ then must evaluate the intensity and persistence of the claimant's pain to determine the extent to which it affects his ability to work. SSR 96-7p, at *2; *see also Craig*, 76 F.3d at 595.

The latter analysis often requires the ALJ to determine "the degree to which [the claimant's] statements can be believed and accepted as true." SSR 96-7p, at *2, *4 (instructing

---

10. Thus, the ALJ's decision to cite that evidence, if error, was harmless. *See Kersey v. Astrue*, 614 F. Supp. 2d 679, 696 (W.D. Va. 2009) ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.").

[7] Objective medical evidence is defined by regulation as "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. §§ 404.1528(b)–(c), 404.1529(a); 20 C.F.R. §§ 416.928(b)–(c), 416.929(a). "Symptoms" are the claimant's description of his or her physical or mental impairment. 20 C.F.R. §§ 404.1528(a), 416.928(a).

11

ALJs to make a credibility finding "whenever the individual's statements about the intensity, persistence, and limiting effects of [his] symptoms are not substantiated by the objective medical evidence"). The ALJ may not reject the claimant's description of his symptoms "solely because the available objective medical evidence does not substantiate" that subjective description. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *see also Hines v. Barnhart*, 453 F.3d 559, 563–64 (4th Cir. 2006). Rather, he must consider "all the available evidence" in the record, including the claimant's statements, his treatment history, and the objective medical evidence. 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ must give specific reasons "grounded in the evidence" for the weight assigned to a claimant's statements. SSR 96-7p, at *4. A reviewing court will defer to the ALJ's credibility determination except in "exceptional circumstances." *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)). "Exceptional circumstances include cases where a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Edelco*, 132 F.3d at 1011.

   *1.    The ALJ's Findings*

The ALJ found that Bin-Salamon's muscle, ligament, or fascia disorders, R. 13, "could reasonably be expected to cause [his] alleged symptoms," but that Bin-Salamon's statements describing the intensity, persistence, and limiting effects of those symptoms were "not credible to the extent that they [were] inconsistent with" the RFC determination, R. 18. He gave four reasons for finding Bin-Salamon's statements not fully credible. *See id.*

First, the ALJ found that Bin-Salamon's treatment record, which "contained gaps" and was "not very extensive," weighed against his allegations of total disability. *Id.* Second, he found that Bin-Salamon's treatment was "fairly routine and conservative" in part because Bin-Salamon

12

had not undergone surgery, if it had been recommended at all. *Id.* Third, the ALJ found that Bin-Salamon's complaints of debilitating pain were inconsistent with mild findings on diagnostic images of his neck, back, knee, and feet. *Id.* Finally, he found that none of Bin-Salamon's treating physicians had imposed restrictions greater than those reflected in the RFC. *Id.*

   2.   *Analysis*

The ALJ "provided a comprehensive list of reasons," with supporting references to the record, for discrediting Bin-Salamon's claim that he cannot work at all. *See Cooke v. Colvin*, No. 4:13cv18, 2014 WL 4567473, at *4 (W.D. Va. Sept. 12, 2014) (Kiser, J.) (finding no legal error where the ALJ did the same). Contrary to Bin-Salamon's argument, the ALJ did not discredit his statements solely because they were not substantiated by medical signs and laboratory findings. He gave four specific reasons, each of which is adequate, consistent with other factual findings, and supported by substantial evidence in the record. *See Hines*, 453 F.3d at 563–64 ("The ALJ refused to credit Mr. Hines with having debilitating pain because a laundry list of objective indicators did not appear in [his] medical records.").

A claimant's failure to obtain treatment can weigh against his credibility unless he has "good reasons" for his failure or noncompliance. *Mabe v. Colvin*, 4:12cv52, 2013 WL 6055239, at *7 (W.D. Va. Nov. 15, 2013) (Kiser, J.) (citing SSR 96-7p, at *7). Bin-Salamon alleged onset of disability as of April 2008. The ALJ correctly found that Bin-Salamon received no treatment for his foot and neck impairments between April 2008 and January 2010 and again between June 2011 and February 2012. *See* R. 18. Bin-Salamon offers no reason, and I can find none in the record, that might explain these significant gaps in treatment during periods he claims to have suffered from disabling pain. Thus, it was not unreasonable for the ALJ to find that Bin-Salamon's failure to obtain treatment during significant periods after his alleged onset date

13

"weigh[ed] against [his] allegations of a totally disabling impairment," R. 18. *See Mabe*, 2013 WL 6055239, at *7.

The ALJ also found that Bin-Salamon's treatment had been "fairly routine and conservative." R. 18. While there is "no bright-line rule [for] what constitutes 'conservative' versus 'radical' treatment," *Gill v. Astrue*, No. 3:11cv85-HEH, 2012 WL 3600308, at *6 (E.D. Va. Aug. 21, 2012), "[a]n unexplained inconsistency between the claimant's characterization . . . of [his] condition and the treatment [he] sought to alleviate that condition" can bear heavily on the claimant's credibility, *Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994) (citing the current 20 C.F.R. § 416.929(c)(3)). Bin-Salamon's healthcare providers prescribed oral medication, steroid injections, orthotics, and exercise to manage pain caused by gout and plantar fasciitis. *See, e.g.*, R. 282, 285, 289, 305–06, 309, 319, 326, 333, 348, 370. In June 2010, Bin-Salamon told Dr. Reese that injections, splints, and foot exercises helped get his pain level down to "zero." R. 308. Medical records do not suggest that Dr. Reese or Dr. LeNoach recommended more aggressive treatment, such as surgery. *See* R. 308, 309, 325, 368–69.

In May 2011, Dr. Hurt expressly recommended "conservative" treatment in lieu of surgery to manage Bin-Salamon's neck pain. R. 353. Dr. Saleeby recommended the same in June 2011, but Bin-Salamon "did not seem interested" in anything except narcotic pain medication. *See* R. 332–33. On this record, it was not unreasonable for the ALJ to conclude that Bin-Salamon's routine and conservative treatment undermined his complaints of disabling pain.

The ALJ also found that diagnostic images did not "provide[] objective support" for Bin-Salamon's description of the "extent or intensity of . . . [his] physical symptoms." R. 18. He correctly noted that MRIs and X-rays of Bin-Salamon's neck, back, knees, and feet demonstrated mild degenerative changes. *See* R. 18, 326, 353, 356. Physical examinations during the relevant

14

period also were consistently within normal limits. *See, e.g.*, R. 283, 287, 326, 331–32, 363, 368. In June 2011, for example, Bin-Salamon exhibited an "unstable gait" only when Dr. Saleeby asked about his foot pain. R. 332. Nurse Davis did not note any gait abnormalities when Bin-Salamon said he was "unable to walk without assistance" in December 2010. R. 318. Bin-Salamon also exhibited a normal station and gait in March and April 2011. *See* R. 361, 363. The ALJ was not required to accept Bin-Salamon's allegations of debilitating pain to the extent that they were "inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause [that] pain." *Craig*, 76 F.3d at 595; *accord* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

Finally, the ALJ found that none of Bin-Salamon's treating physicians limited his physical activity beyond the restrictions reflected in the RFC. *See* R. 18. The information that a treating or examining source provides about a claimant's symptoms is "an important indicator" of the intensity, persistence, and limiting effects of symptoms, such as pain, that can be "difficult to quantify." 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Thus, a healthcare provider's failure to impose "symptom-related functional limitations and restrictions," *id.*, can weigh against the claimant's complaints of debilitating pain. 20 C.F.R. §§ 404.1529(c)(3)(vii), 416.929(c)(3)(vii); *Hicks v. Colvin*, No. 7:12cv618, 2014 WL 670916, at *6 (W.D. Va. Feb. 20, 2014) ("Finally—and significantly—the ALJ noted that the claimant's allegations of totally disabling symptoms were unsupported by any restriction placed on her by her treating physicians.").

Following Bin-Salamon's partial spinal fusion in October 1986, the surgeon instructed Bin-Salamon to avoid heavy lifting, exercise, prolonged standing, and driving. R. 278. Between 1996 and 2008, Bin-Salamon held several jobs that required him to stand for ten hours a day and lift up to 175 pounds. *See generally* R. 46–47, 153–70, 193–200. He now alleges that he has been

15

disabled by neck and foot pain since April 1, 2008. *See* R. 211. As the ALJ noted, none of Bin-Salamon's healthcare providers imposed any symptom-related restrictions on his activity after that date.[8] On the contrary, Dr. Saleeby noted in June 2011 that "staying as active as tolerated" was an "essential part" of his recommended approach for managing Bin-Salamon's chronic pain. R. 333. Bin-Salamon "did not seem to agree" with Dr. Saleeby's assessment. *Id.* Accordingly, I find that the ALJ's credibility determination is supported by substantial evidence.

B.     *Bin-Salamon's RFC*

Bin-Salamon also argues that the ALJ's RFC determination is legally flawed because he considered only the objective medical evidence and "disregarded" Bin-Salamon's subjective statements. *See* Pl. Br. 9. A claimant's RFC is the most he can do on a regular and continuing basis despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). "It is an administrative assessment made by the Commissioner based on all the relevant evidence in the [claimant's] record," including objective medical evidence, medical-source opinions, and the claimant's own statements. *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011); *accord* SSR 96-8p, 1996 WL 374184 (July 2, 1996). The RFC must reflect the combined limiting effects of impairments "supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints." *Carter v. Astrue*, No. 3:10cv510, 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011), *adopted by* 2011 WL 2693392 (July 11, 2011); *accord* 20 C.F.R. §§ 404.1545(e), 416.945(e).

The ALJ found that Bin-Salamon's "disorders of the muscle, ligament, and fascia" were severe but not disabling. R. 13–14, 19–20. Specifically, he found that Bin-Salamon could

---

[8] In November 2011, Bin-Salamon testified that the doctor who performed his recent hemorrhoid surgery instructed him to never again lift more than ten pounds. R. 44. Bin-Salamon's attorney did not submit these medical records to the agency. *See* R. 2, 44, 50.

16

frequently lift and carry ten pounds, occasionally lift and carry twenty pounds, stand and walk for four hours in an eight-hour day, and sit for more than six hours in an eight-hour day. R. 14, 19. The ALJ considered all of the relevant evidence in making this determination, just as the regulations require him to do. *See* R. 15 (Bin-Salamon's statements); R. 15–18 (treatment history, objective medical evidence, examining-source statements); R. 19 (state-agency medical opinions). Indeed, he explained that his RFC determination was supported by Bin-Salamon's "routine and conservative treatment," mild findings on physical exams and diagnostic tests, Dr. Beazley's RFC assessment,[9] and the absence of more restrictive functional assessments from treating or examining medical sources. *See* R. 19.

The ALJ's RFC limits Bin-Salamon's capacity to sit, stand, and walk such that he can perform "sedentary" work. R. 19, 48. Sedentary work may require "occasional[]" standing and walking, 20 C.F.R. §§ 404.1567(a), 416.967(a), or up to one-third (2.66 hours) of an eight-hour workday, R. 215. Dr. Beazley opined that Bin-Salamon could meet these requirements based on the medical evidence available through November 9, 2010. *See* R. 216. The ALJ may rely on a non-examining physician's opinion when it is consistent with the record, *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984), and Bin-Salamon does not point to any credible evidence in the record that arguably conflicts with Dr. Beazley's RFC assessment.

Medical records dated after November 2010 further support the ALJ's RFC determination. Nurse Davis did not document any physical abnormalities on December 30, 2010, the one occasion Bin-Salamon reported that he was "unable to walk without assistance." R. 318. When Bin-Salamon complained of foot pain in January and February 2011, Dr. LeNoach

---

[9] The ALJ did not explain why he rejected Dr. Williams's two-hour standing/walking restriction in favor of Dr. Beazley's four-hour restriction. R. 19. This error is harmless because the VE testified that Bin-Salamon could perform specific sedentary jobs even if he could stand and walk only for two hours during an eight-hour day. R. 48–49.

17

encouraged him to get "better inserts" for his shoes and restart his gout medication. *See* R. 326, 368–69. In June 2011, Bin-Salamon exhibited an "unstable gait" only when Dr. Saleeby asked about his foot pain. *Id.* Otherwise, he stood without difficulty and walked without assistance. R. 332. A head-to-toe physical exam was generally within normal limits, R. 331–32, except for stiffness and reduced range of motion in Bin-Salamon's neck, R. 331. Dr. Saleeby encouraged Bin-Salamon to stay as active as he could. R. 333.

This evidence provides ample support for the ALJ's RFC assessment. The ALJ's reliance on the VE's testimony in response to a hypothetical question reflecting this RFC, *see* R. 20, 48–49, 50, was also proper. *See Hines*, 453 F.3d at 566. The VE testified that a person with Bin-Salamon's vocational profile and this RFC could perform "a wide range of sedentary jobs," including check cashier, audit clerk, and appointment clerk. R. 48. Bin-Salamon does not object to this testimony or to the ALJ's finding that these particular jobs exist in significant numbers. *See* Pl. Br. 9. Thus, the Commissioner's final decision that Bin-Salamon is not disabled is supported by substantial evidence. *See Walls v. Barnhart*, 296 F.3d 287, 292 (4th Cir. 2002) (holding that a VE's reliable testimony provides substantial evidence to support the Commissioner's final decision).

## V. Conclusion

This Court must affirm the Commissioner's final decision that Bin-Salamon is not disabled if that decision is consistent with the law and supported by substantial evidence in the record. Both requirements were met here. Accordingly, I recommend that the Court **DENY** Bin-Salamon's motion for summary judgment, ECF No. 12, **GRANT** the Commissioner's motion for summary judgment, ECF No. 14, and **DISMISS** this case from the docket.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

>   Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

                    ENTER: December 31, 2014

                    */s/ Joel C. Hoppe*

                    Joel C. Hoppe
                    United States Magistrate Judge